POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA KABULA, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| CEPTON, INC., JUN PEI, DONG CHANG, and MITCHELL HOURTIENNE, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Lisa Kabula ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cepton, Inc. ("Cepton" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or sold shares Cepton common stock between July 29, 2024 and January 6, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Prior to the Company's merger with Koito Manufacturing Co., Ltd. ("Koito") (the "Koito Acquisition" or the "Merger") (as described below), Cepton was an electronics company focused on the deployment of high performance, mass-market light detection and ranging ("lidar") technologies to deliver safety and autonomy across the Automotive and Smart Infrastructure markets.  The Company offered near-range lidars, long-range lidars and ultra-long-range lidars, automotive software and smart lidar systems that include its perception software.

3.      As of July 2023, Koito, a Japanese manufacturer of automotive lighting equipment, had invested $200 million in Cepton in exchange for common and preferred stock amounting to 30.1% of Cepton's voting power on an as-converted basis and held two out of seven seats on the Company's Board of Directors (the "Board").  In October 2023, Koito requested that the Board form a special committee (the "Special Committee") to negotiate a potential transaction with Koito.  In December 2023, Koito announced a bid to acquire Cepton for $3.17 per share in cash in a going private transaction.

4.      In July 2024, Cepton announced that it had accepted Koito's bid to acquire all of the Company's outstanding capital stock not owned by Koito for $3.17 per share in an all-cash

transaction. According to Cepton, the Koito Acquisition would purportedly "complement Koito's existing sensor technology roadmap, while providing Cepton with the financial stability and scalability that are crucial to the commercialization of its lidar technology."

5.     The Koito Acquisition closed on January 7, 2025, at which point all outstanding Cepton shareholders received $3.17 per share of Cepton common stock in cash. In a press release issued that same day, Cepton stated that the Merger "marks a strategic milestone in the industrialization of Cepton's cutting-edge lidar technology, combining the strengths of both companies to reshape future mobility" and "[s]upported by Koito's world-renowned automotive expertise, Cepton will continue to commercialize its lidar solutions with a strong focus on quality, reliability and sustainability."

6.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cepton had received a credible third-party bid valuing Cepton at more than double the Koito Acquisition; (ii) Cepton's Board of Directors failed to meaningfully explore the foregoing offer and failed to disclose its terms when recommending that Cepton's shareholders approve the Koito Acquisition; (iii) consequently, Cepton's shareholders were deprived of the opportunity to meaningfully consider whether to accept or reject the Koito Acquisition; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

7.     Investors began to learn the truth four months after the Merger closed when, in May 2025, former Cepton shareholders filed two verified class action complaints in the Court of Chancery for the State of Delaware against, among others, Cepton and certain of the Company's

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

executive officers, in connection with the Koito Acquisition.[1]  Then, in September 2025, a redacted version of an amended consolidated class action complaint (the "Amended Complaint") filed in the Delaware Action became publicly available.  *See* Delaware Action, Dkt. No. BL-25. The Amended Complaint followed a review of books and records produced by Cepton in response to plaintiffs' demands made under 8 *Del. C.* § 220.  *See id.* at 2.  The Amended Complaint alleges that Cepton's Board agreed to the Koito Acquisition "at a price that was so unreasonable as to shock the conscience, and then pitched the grossly unfair deal to stockholders with a Proxy that concealed critical facts."  *See id.* ¶ 2.  Moreover, the Amended Complaint alleges that "the Proxy failed to disclose Cepton's receipt of—and the Board's utter failure to explore—a credible third-party bid valuing Cepton at **more than double**" the Koito Acquisition.  *Id.* (Emphasis in original). The Amended Complaint further alleges that Cepton's Chief Executive Officer ("CEO") Defendant Jun Pei ("Pei") was subject to conflicts in his negotiations with Koito and encouraged the Board to recommend accepting the Koito Acquisition so as to protect his own personal economic interests at the expense of Cepton's stockholders.  *See id.* ¶¶ 2-14.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

---

[1] The first action, styled *Ding v. Pei, et al*, Case No. 2025-051 (the "*Ding* Action"), was brought on May 12, 2025.  The second action, styled *ODS Capital LLC, et al v. Koito Manufacturing Co. Ltd, et al.*, Case No. 2025-0596 (the "*ODS* Action"), was brought on May 29, 2025.  On July 14, 2025, the *Ding* and *ODS* Actions were consolidated and restyled as *In re Cepton, Inc. Stockholder Litigation*, Case No. 2025-0519-LWW (the "Delaware Action").

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Cepton is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Cepton securities at artificially inflated prices during the Class Period and held Cepton common stock as of the January 7, 2025 closing date of the Merger that were exchanged for $3.17 in cash upon the closing of the Merger, and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Cepton was a Delaware corporation that maintained principal executive offices located at 399 West Trimble Road, San Jose, California 95131.  Cepton's common stock traded in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "CPTN."

15.     Defendant Pei served as Cepton's President and CEO at all relevant times.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16.     Defendant Dong Chang ("Chang") served as Cepton's Interim Chief Financial Officer at all relevant times.

17.     Defendant Mitchell Hourtienne ("Hourtienne") served as Cepton's Chief Commercial Officer at all relevant times.

18.     Defendants Pei, Chang, and Hourtienne are collectively referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Cepton's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of Cepton's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with Cepton, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     Cepton and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Prior to the Koito Acquisition, Cepton was an electronics company focused on the deployment of high performance, mass-market lidar technologies to deliver safety and autonomy across the Automotive and Smart Infrastructure markets.   The Company offered near-range lidars,

long-range lidars and ultra-long-range lidars, automotive software and smart lidar systems that include its perception software.

22.    As of July 2023, Koito, a Japanese manufacturer of automotive lighting equipment, had invested $200 million in Cepton in exchange for common and preferred stock amounting to 30.1% of Cepton's voting power on an as-converted basis and held two out of seven seats on the Company's Board.  In October 2023, Koito requested that the Board form the Special Committee to negotiate a potential transaction with Koito.  In December 2023, Koito announced a bid to acquire Cepton for $3.17 per share in cash in a going private transaction.

**Materially False and Misleading Statements Issued During the Class Period**

23.    The Class Period begins on July 29, 2024, when Cepton issued a press release announcing that it had signed an agreement to enter into the Koito Acquisition.  The press release stated, in relevant part:

> Cepton [. . .] announced today that it has signed a definitive agreement [. . .] providing for the acquisition by [Koito], a leading automotive tier one supplier, of all of the outstanding capital stock of the Company not owned by Koito for $3.17 per share in an all-cash transaction.
>
> Cepton stockholders will receive $3.17 per share in cash, which represents a premium of approximately 25.3% to the closing price as of Friday, July 26, 2024. The material terms of the transaction will be described in Cepton's current report on Form 8-K, which will be filed with the Securities and Exchange Commission today.
>
> ***The proposed transaction will complement Koito's existing sensor technology roadmap, while providing Cepton with the financial stability and scalability that are crucial to the commercialization of its lidar technology. After the transaction, Cepton will operate as a privately held indirect subsidiary of Koito in the U.S.***
>
> "I am excited about the next stage of Cepton's growth as we embark on a new journey together with Koito," said [Defendant] Pei[.] "Over the past few years, we have achieved many remarkable milestones in product innovation and development, establishing ourselves as one of the most trusted lidar solutions providers in the automotive industry. A significant portion of our efforts were greatly supported by Koito as our long-term partner and investor.

7

"As we carry on our pioneering spirit as a Silicon Valley company and deepen our commitment to driving cutting-edge innovation, leaning on Koito's century-old heritage of engineering rigor will heighten our dedication to delivering quality solutions to customers worldwide. *Our partnership with Koito will provide us with unique access to a broader range of opportunities and resources and help us stay resilient to industry challenges in a way no other lidar company can. This will position us as a leading automotive lidar company for years to come, as Cepton continues to execute current automotive programs and actively manage future [original equipment manufacturer ("OEM")] initiatives*."

\*\*\*

[Defendant] Hourtienne[] adds: "*In addition to broadening business platforms for both Koito and Cepton, we expect our partnership to make a positive impact on the overall automotive lidar ecosystem, driving industry standards and accelerating adoption at scale. We are ready to better support our automotive OEM customers in safely deploying lidar-enhanced assisted and autonomous driving platforms through a streamlined and stabilized supply chain, making safe autonomy truly available in every consumer vehicle*."[2]

24.     On August 12, 2024, Cepton issued a press release announcing the Company's Q2 2024 results. The press release listed as a "business highlight" that the Company "[s]igned an Agreement and Plan of Merger providing for the acquisition by [Koito] on July 29, 2024 of all of the outstanding capital stock of Cepton not owned by Koito for $3.17 per share in an all-cash transaction."

25.     On September 25, 2024, Cepton filed a preliminary proxy statement related to the Koito Acquisition on Form PREM14A with the SEC (the "Preliminary Proxy Statement"). In discussing the recommendation of the Special Committee, the Preliminary Proxy Statement stated, in relevant part:

After careful consideration, including a thorough review of the Merger Agreement, the other transaction documents and the terms of the merger, and taking into account the presentations made to the Special Committee and various other factors discussed and considered by the Special Committee, and after due consideration of its fiduciary duties under applicable law, *the Special Committee has determined that the terms of the Merger Agreement, the other transaction documents and the merger, including the merger consideration payable in connection therewith, are*

---

[2] All emphases included herein are added unless otherwise indicated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*advisable, fair to, and in the best interests of, the Company and its Unaffiliated Stockholders*[.] Accordingly, the Special Committee unanimously recommended that the Board approve, adopt and declare advisable and in the best interests of the Company and its stockholders the Merger Agreement, the other transaction documents and the merger.

26.    Further, in discussing the background of the Koito Acquisition, the Preliminary Proxy Statement stated, in relevant part:

The Board regularly evaluates the Company's strategic direction and ongoing business plans *with a view toward strengthening the Company's business and enhancing stockholder value*. As part of this evaluation, the Board has, from time to time, considered a variety of strategic alternatives. These have included, among others, (1) the continuation of, and potential improvements to, the Company's current business plan; (2) potential expansion opportunities through acquisitions, partnerships or other commercial relationships; (3) various capital raising alternatives; and (4) other financial and strategic alternatives, including the sale of the Company.

\*\*\*

On October 3, 2023, Dr. Pei received an unsolicited non-binding letter of interest from a potential strategic acquirer ("Party C"), which he promptly shared with the Board. Party C proposed an acquisition of Cepton by a merger transaction for stock consideration in the surviving company; however, the Board determined not to pursue the transaction.

\*\*\*

*Between January 2024 and March 2024, representatives of [Craig-Hallum Capital Group LLC ("Craig-Hallum")] were authorized to conduct a market check*, contacting twelve potential strategic acquirors, including Party A. Of the twelve potential strategic acquirors contacted, three parties requested follow up conference calls that were held on January 29, 2024, January 30, 2024 and February 6, 2024, respectively, two parties requested a confidentiality agreement with the Company, one of which was executed, and such party was granted access to the Company's electronic data room. Ultimately, none of the parties elected to proceed and no alternative offers were received by the Special Committee.

\*\*\*

On July 28, 2024, the Special Committee held a special meeting to consider the proposed final terms of the Potential Transaction, including the form of Merger Agreement. Also in attendance were representatives of Cooley and Craig-Hallum. Representatives of Cooley reviewed with the Special Committee its fiduciary duties and the key terms of the Merger Agreement. *Representatives of Craig-Hallum highlighted for the Special Committee the above-described process that had been*

*conducted in respect of the market check with other prospective strategic partners and their valuation analysis of other comparable public M&A transactions*. Representatives of Craig-Hallum then presented to the Special Committee their financial analysis of Koito's $3.17 per share of Cepton common stock consideration to be received by the Cepton stockholders pursuant to the Merger Agreement. Craig-Hallum then delivered its oral opinion, which was subsequently confirmed in writing, to the effect that, based on and subject to the assumptions in the written opinion which was delivered on July 29, 2024 and is attached as Annex D to this Proxy Statement, *Craig-Hallum was of the opinion that the merger consideration to be received by the Unaffiliated Stockholders pursuant to, and in accordance with, the terms of the Merger Agreement, is fair, from a financial point of view, to such holders of shares of Cepton common stock*.

27.    In addition, in discussing the "reasons for the transaction," the Preliminary Proxy Statement stated, in relevant part:

In evaluating and approving the merger and in making their determinations and recommendations, the Special Committee and the Board gave careful consideration to a number of factors including, among others, the following:

- *Premium*.    The cash consideration to be received by the Unaffiliated Stockholders in the transaction represents a premium of approximately 25% to the closing price of the Company's common stock on Nasdaq on July 26, 2024, the most recent trading day prior to the signing of the Merger Agreement, and a premium of approximately 26% to the closing price of the Company's common stock on Nasdaq on June 26, 2024, one month prior to the signing of the Merger Agreement.

- *Compelling Value Relative to Alternatives*.    The Special Committee conducted a pre-signing market check process involving outreach by Craig-Hallum to potential counterparties for acquisition transactions. *The Special Committee determined that it was unlikely that any of those parties would complete a transaction on terms that were superior to the merger, taking into account, among other things, the stock ownership position of Koito in the Company and the fact that Koito was consistent in its position that it has no interest in (and would not as a stockholder support or consent to) a disposition or sale of its holdings in the Company or any alternative change of control transaction involving the Company*. The Special Committee also considered the Company's standalone business strategy in the context of current economic and market conditions and the Management Projections and concluded that the merger would provide greater and more certain value to the Unaffiliated Stockholders than would reasonably be expected from the continued execution of the Company's strategic plan.

- *Certainty and Immediate Liquidity*.    *The cash consideration of $3.17 per share of our common stock provides certainty, immediate value and*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*liquidity to the Unaffiliated Stockholders while eliminating the effect on our stockholders of likely further dilution, long-term business and execution risk or to financial markets or economic conditions*.

***

- *Supported by Significant Stockholders*.   The merger must be approved by holders of a majority of the outstanding shares of the Company's common stock. Pursuant to Voting Support Agreements, certain significant stockholders of the Company (*[Defendant Pei]*, Dr. Jun Ye, a member of the Company's Board, and Dr. Mark McCord, the former Chief Technology Officer of the Company) *have agreed to vote all of their shares of our common stock in favor of the merger*. Koito has also agreed to vote all of its shares of Company capital stock in favor of the merger. The combination of these voting commitments makes approval of the merger by Company stockholders highly likely.

28.     On November 7, 2024, Cepton issued a press release announcing the Company's Q3 2024 results.  The press release quoted Defendant Pei as stating, in relevant part, that "the recently announced *acquisition by Koito underscores our shared vision for long-term growth and innovation*" and "[a]s we work toward completing this transaction, our focus remains on executing our strategy, deepening OEM partnerships, and driving the adoption of our advanced lidar solutions across key industries."

29.     On November 13, 2024, Cepton filed preliminary proxy soliciting materials related to the Koito Acquisition on Form PRER14A with the SEC which contained substantively similar discussions of the recommendation of the Special Committee, the background of the Koito Acquisition, and the "reasons for the transaction" as discussed, *supra*, in ¶¶ 25-27.

30.     On November 21, 2024, Cepton filed a Definitive proxy statement related to the Koito Acquisition on Form DEFM14A with the SEC which contained substantively similar discussions of the recommendation of the Special Committee, the background of the Koito Acquisition, and the "reasons for the transaction" as discussed, *supra*, in ¶¶ 25-27.

31.     The Koito Acquisition closed on January 7, 2025 with Cepton shareholders receiving $3.17 per share in exchange for each of their shares of Cepton stock.  In a press release

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  issued that same day, Cepton stated that the Merger "marks a strategic milestone in the

2  industrialization of Cepton's cutting-edge lidar technology, combining the strengths of both

3  companies to reshape future mobility."

4      32.     The statements referenced in ¶¶ 23-31 were materially false and misleading

5  because Defendants made false and/or misleading statements, as well as failed to disclose material

6  adverse facts about the Company's business, operations, and compliance policies.  Specifically,

7  Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cepton had

8  received a credible third-party bid valuing Cepton at more than double the Koito Acquisition; (ii)

9  Cepton's Board of Directors failed to meaningfully explore the foregoing offer and failed to

10 disclose its terms when recommending that Cepton's shareholders approve the Koito Acquisition;

11 (iii) consequently, Cepton's shareholders were deprived of the opportunity to meaningfully

12 consider whether to accept or reject the Koito Acquisition; and (iv) as a result, Defendants' public

13 statements were materially false and misleading at all relevant times.

14

15                              **The Truth Emerges**

16      33.     Investors began to learn the truth of the circumstances surrounding the Merger

17 four months after it closed when, in May 2025, former Cepton shareholders filed two verified

18 class action complaints in the Court of Chancery for the State of Delaware against, among others,

19 Cepton and certain of the Company's executive officers, in connection with the Koito

20 Acquisition.

21      34.     Then, on September 9, 2025, a redacted version of the Amended Complaint was

22 filed in the Delaware Action.  *See* Delaware Action, Dkt. No. BL-25.  The Amended Complaint

23 followed a review of books and records produced by Cepton in response to plaintiffs' demands

24 made under 8 *Del. C.* § 220.  *See id.* at 2.  The Amended Complaint alleges that Cepton's Board

25 agreed to the Koito Acquisition "at a price that was so unreasonable as to shock the conscience,

26

27

28

and then pitched the grossly unfair deal to stockholders with a Proxy that concealed critical facts." *See id.* ¶ 2. The Amended Complaint further alleges that, among other things, "the Proxy failed to disclose Cepton's receipt of—and the Board's utter failure to explore—a credible third-party bid valuing Cepton at **more than double**" the Koito Acquisition. *Id.* (Emphasis in original). The Amended Complaint also alleges that Defendant Pei was subject to conflicts in his negotiations with Koito and encouraged the Board to recommend accepting the Koito Acquisition so as to protect his own personal economic interests at the expense of Cepton's stockholders. *See id.* ¶¶ 2-14.

35.     In discussing the background of the Koito Acquisition, the Amended Complaint alleges that Koito proposed the Merger just ten days after Cepton "asserted a $39 million cost recovery claim against Koito arising from the cancellation of a production award with General Motors." *Id.* ¶ 3. Defendant Pei's finance team—who were allegedly conflicted as they were "negotiating against their future employer"—reduced the cost recovery claim by $19 million in connection with preparing projections. *Id.* As a result, Cepton's financial advisor, Craig-Hallum, used a depressed cash flow figure to value the Company in connection with the Merger. *See id.* According to the Amended Complaint, this $19 million reduction alone "decreased the value of Cepton in Craig-Hallum's analysis by $1.07 per share" and Craig-Hallum's valuation analyses also "erroneously valued the Company on a liquidation basis—improperly subtracting more than $100 million in value ascribed to a liquidation preference from the enterprise value that Craig-Hallum derived for Cepton," which allegedly "further depressed the Company's equity value generated by Craig-Hallum's discounted cash flow analyses by $4.32 per share." *See id.* ¶¶ 3-4. If Cepton's cost recovery claim was properly accounted for and Cepton was "appropriately valued on a standalone basis without regard to the liquidation preference," the Company's equity value allegedly would have increased to $8.49 per share, or nearly 2.7x the Merger consideration. *Id.*

¶ 5.  In addition, Craig-Hallum's valuation failed to account for a new production award that the Company secured "just days before the Special Committee approved the [Koito Acquisition], but concealed by [Defendant] Pei," that would have further materially increased the equity value per share of Cepton common stock.  *Id.*

36.     As alleged in the Amended Complaint, this "higher standalone valuation would, moreover, have been consistent with recent third-party interest in Cepton at a valuation significantly in excess of the [Koito Acquisition] consideration" the Company had received before Cepton "proceeded to achieve various new business milestones in 2024."  *See id.* ¶ 6.  However, the Board declined to engage with the third party or hold a meeting to consider the more lucrative proposal.  *See id.*  Instead, the Board informed Koito that the Company had received the higher proposal, after which Koito informed Cepton that it was interested in pursuing a take-private transaction of its own.  *See id.* ¶ 7.

37.     While the Board deemed the more lucrative offer as "unworthy of even being discussed," it responded to Koito's $3.17 per share bid by commencing a Special Committee process, which the Amended Complaint characterized as "window-dressing at best," as the Special Committee "did not seek to leverage the full $39 million cost recovery claim against Koito in negotiations," nor did it "perform a valuation of Cepton that appropriately accounted for the full amount of that claim."  *Id.* ¶ 8.  Moreover, while the Special Committee claimed it had performed a market check to "to assess the value of the Company to market buyers, that market check inexplicably failed to include any outreach" to the third-party suitor, even though the third-party's offer "had effectively instigated the process leading to the [Koito Acquisition] in the first place."  *Id.*  Further, the Special Committee permitted Defendant Pei to "negotiate post-close employment directly with Koito—**after** Koito conditioned the deal on retaining Pei as CEO—and did nothing to protect stockholders as Pei granted Koito unreasonable concessions inimical

14

to value maximization, and inferably approved the use of highly conservative assumptions to prepare the projections that Craig-Hallum used to value Cepton." *Id.* ¶ 9 (emphasis in original).

38.    Further, Defendant Pei allegedly "hid critical information from the Special Committee that rendered the fairness opinion prepared in connection with the" Koito Acquisition, including that Cepton had received a "significant series production award internally projected to generate $40 million in revenue over three years[.]" *Id.* ¶ 10.  The production award would have "prompted an adequately informed Special Committee to direct management to update Cepton's projections and demand a higher price from Koito," but recognizing that "renegotiating the price with Koito at that late stage would jeopardize the [Koito Acquisition]—and along with it, [Defendant] Pei's new employment contract with Koito (with higher compensation), and the over $8 million that [Defendant] Pei stood to earn from the [Koito Acquisition]," the Amended Complaint alleges that Defendant Pei committed a fraud on the Board by concealing the production award from the Special Committee in advance of its vote to approve the Koito Acquisition.  *See id.*

39.    The Amended Complaint alleges that, after approving Koito's proposal of $3.17 per share, the Board then proceeded to pitch the Koito Acquisition to stockholders "on the basis of badly deficient disclosure materials," including by "act[ing] to conceal" the superior acquisition offer it had received and "misrepresent[ing] the Board's consideration thereof."  *See id.* ¶ 12.  Specifically, the Board allegedly "opaquely disclosed its receipt of a proposal from 'Party C,'" but did not disclose the terms of the superior proposal, and "misrepresented in the Proxy that it had reached an informed "determin[ation] not to pursue the" superior proposal, "when in fact the Board never even met to consider it."  *Id.*  Moreover, the Amended Complaint notes that the Proxy "prominently touted the Special Committee's purported 'market check' as supporting the fairness of the [Koito Acquisition], without disclosing that the market check had

failed to include any outreach to" the superior third-party bidder. *Id.* In addition, the Amended Complaint alleges that the Proxy failed to disclose several other facts that were material to the voting decisions of stockholders, including, among other things, Defendant Pei's failure to apprise the Special Committee of the production award Cepton had received in advance of their meeting to approve the Koito Acquisition, "Cepton's outside counsel's disabling conflict of interests," "reliable projections from February 2024," and "a secret vote to boost the transaction fee payable to Craig-Hallum in connection with the [Koito Acquisition] by giving Craig- Hallum credit for services that it never performed." *Id.*

40.     Ultimately, the Amended Complaint alleges that the circumstances surrounding the Koito Acquisition "constitute ingredients of a mulligan stew that tastes beyond foul" and that Cepton's Board "cannot have approved the [Koito Acquisition] in good faith" as its members "failed to protect the interests of the Company's stockholders, failed to discharge their context specific duty to secure the best price reasonably attainable for stockholders, and instead merely capitulated to Koito at every turn." *Id.* ¶ 13.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

42.     During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

3

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

4

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or sold

5

shares of Cepton common stock during the Class Period (the "Class"); and were damaged as a

6

result of Defendants' violations of the federal securities laws.  Excluded from the Class are

7

Defendants herein, the officers and directors of the Company, at all relevant times, members of

8

their immediate families and their legal representatives, heirs, successors or assigns and any entity

9

in which Defendants have or had a controlling interest.

10

44.    The members of the Class are so numerous that joinder of all members is

11

impracticable.  Throughout the Class Period, Cepton securities were actively traded on the

12

NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and

13

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

14

or thousands of members in the proposed Class.  Record owners and other members of the Class

15

may be identified from records maintained by Cepton or its transfer agent and may be notified of

16

the pendency of this action by mail, using the form of notice similar to that customarily used in

17

securities class actions.

18

45.    Plaintiff's claims are typical of the claims of the members of the Class as all

19

20

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

21

federal law that is complained of herein.

22

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class

23

and has retained counsel competent and experienced in class and securities litigation.  Plaintiff

24

has no interests antagonistic to or in conflict with those of the Class.

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Cepton;

- whether the Individual Defendants caused Cepton to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Cepton securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

49.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cepton securities were traded in an efficient market;

18

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Cepton securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Cepton securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cepton securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cepton securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cepton's finances and business prospects.

56.     By virtue of their positions at Cepton, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Cepton, the Individual Defendants had knowledge of the details of Cepton's internal affairs.

58.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Cepton.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cepton's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Cepton securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Cepton's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cepton securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

59.     During the Class Period, Cepton securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cepton securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff

and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Cepton securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Cepton securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

62.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.    During the Class Period, the Individual Defendants participated in the operation and management of Cepton, and conducted and participated, directly and indirectly, in the conduct of Cepton's business affairs.  Because of their senior positions, they knew the adverse non-public information about Cepton's misstatement of income and expenses and false financial statements.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cepton's financial condition and results of operations, and to correct promptly any public statements issued by Cepton which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cepton disseminated in the marketplace during the Class Period concerning Cepton's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cepton to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Cepton within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cepton securities.

66.     Each of the Individual Defendants, therefore, acted as a controlling person of Cepton.  By reason of their senior management positions and/or being directors of Cepton, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Cepton to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Cepton and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cepton.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

23

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS